LAW OFFICES
DUNTON, SIMMONS & DUNTON, L.L.P.
678 RAPPAHANNOCK DRIVE
POST OFFICE BOX 5
WHITE STONE, VIRGINIA 22578-0005

E. STANLEY MURPHY
ESMURPHY@DSDLAW.COM

TELEPHONE:
(804) 435-4000
FACSIMILE:
(804) 435-1614
dsdlaw.com

August 17, 2017

Via regular mail and email to: jnnonan@ventkerlaw.com

Jeanne E. Noonan, Esq.
VENTTKER HENDERSON, INC.
256 West Freemason Street
Norfolk, Virginia 235120

Re: *FE Partners, et al. v. Chesapeake Marine Railway, LLC, et al.*

Dear Ms. Noonan:

My law firm represents Deagle's Marine Railway, Inc. and Rebecca Lengua. I am also writing on behalf of Dunton Simmons & Dunton, LLP.

I write regarding three subpoenae *duces tecum* that you served over the past five days on Deagle's, Ms. Lengua, and this law firm requesting a vast variety of materials relating to marine railways on property owned by Deagle's that is leased to Chesapeake Marine Railway, LLC. ("CMR"). These subpoenae also request production of communications with CMR, its owners and employees regarding subjects that have no relevance to your dispute with CMR.

Your requests for records are not restricted in time. The railways were in existence prior to 1933 when the property was purchased by Becky Lengua's grandfather. The Deagle family operated the railway for over 50 years but the yard has not been operated by the Deagle family for two decades. Most records have been destroyed. The records that remain are stored in three or four locations and reviewing all of these records in order to comply with your subpoena will be an extremely time-consuming, expensive and onerous process, which certainly cannot be completed in the ten days that you have allowed for compliance.

Records you have requested relating to CMR's tenancy are also quite extensive. This property was leased to CMR 11 years ago and dealing with this tenant has been somewhat contentious. Once again, your subpoena is unrestricted in time

The process is greatly complicated by the facts that Ms. Lengua is the sole caregiver for her 91-year-old mother (who incidentally has been burdened by direct contacts with representatives of your client), and that she is in the early stages of dealing with the estate of her father, Capt. Edward Deagle, who died three months ago. Because your subpoenae request, among other things, "any and all communications by any member of the Deagle family or Deagles Marine Railway, Inc. with [CMR and others] regarding *the facility* (presumably a reference to the property rented to CMR)," the subpoena requires a search

EXHIBIT H

Jeanne E. Noonan, Esq.
August 17, 2017
Page | 2

and review of more than 11 years of paper and electronic communications, the vast majority of which have no bearing whatsoever on your lawsuit.

The difficulty of responding to your subpoenae issued to Ms. Lengua and to Deagle's Marine Railway is also complicated by circumstances that directly affect the Deagle's independent interests.

Deagles Marine Railway, Inc. is currently in litigation itself with CMR regarding the boatyard lease. Although that dispute appears to have been resolved, a final agreement has not been signed. The massive amount of time required to respond to your subpoena not only delays a resolution of that claim but detracts from the available resources of this small company.

All of which brings me to the subpoena that you have served on this law firm.

Our firm has been general counsel for the Deagle's Marine Railway for a number of years. The subpoena that you have served on us touches on a number of matters that we have handled and I can tell you without reservation that the vast majority of the records that you have requested not only are protected by the attorney-client privilege but that they also have no relevance to the issues of your litigation.

In order to respond to your subpoena to Dunton Simmons and Dunton, LLP, it will be necessary for us to review several thousand pages of documents and many emails going back as much as a decade. Doing so will impose a tremendous burden on our small law firm and will result in a significant loss of income in order to protect attorney-client confidences and to determine whether documents and electronic communications that we have are responsive to your subpoena.

Individually and, as a group, your subpoenae are oppressive and largely irrelevant to your dispute with CMR. Responding to the subpoenae will impose significant costs and burdens on each respondent, including in the burden of identifying, segregating, and providing a privilege log for materials protected by the attorney-client privilege.

In order to avoid intervention by the court, all respondents hereby request that you withdraw the subpoena issued to Dunton Simmons & Dunton, LLP and that you modify the scope of the two subpoenae served on Ms. Lengua and Deagle's Marine Railway, Inc.

To facilitate our discussions on this point, I am reproducing here your document request to Deagles and, I assume, to Ms. Lengua.[1] You have requested that these respondents produce the following things on or before this coming Thursday:

---

[1] I have not yet seen the subpoena that was posted on Ms. Lengua's back door, but I assume that it requests the same materials.

Jeanne E. Noonan, Esq.
August 17, 2017
Page | 3

1. Provide any and all documents related to the 100 Ton Railway or 300 Ton Railway located at the shipyard, including, but not limited to, any form of correspondence, plans, reports, permits, invoices, photographs, or any other document referencing the railways, any improvements made to the railways, and the rating or down-rating of any railway.

2. Provide any and all communications by any member of the Deagle family or Deagle's Marine Railway, Incorporated with Jonathan Farinholt, Richard Farinholt, or any employee or agent of Chesapeake Marine Railway, LLC or Chesapeake Boat Works, LLC regarding the facility, the railways, or the Vessel.

As relevant to my clients, your lawsuit alleges that CMR agreed to haul and store *Sequioa* with knowledge that the 100-ton railway was insufficient to accommodate the vessel. These allegations provide the Rule 26 frame of reference for relevance. Bearing in mind these allegations and the newly reinvigorated tests of balancing and proportionality contained in Fed. R. 26 (b) (1),[2] we request that the subpoenae to Ms. Lengua and Deagle's Marine Railway be modified in the following respects:

1. Restrict the scope of Request 1 to materials transmitted to or received from CMR regarding capacity of the 100-ton railway and materials objectively likely to be known to CMR regarding capacity of that railway.

2. Restrict the scope of Request 2 to communications by or on behalf of Deagle's Marine Railway, Inc. with CMR or representatives of CMR regarding capacity of the 100-ton Railway.

3. Limit the scope of each request to exclude materials in the files of Deagle's attorneys, except for non-privileged communications with CMR or its attorneys regarding capacity of the 100-ton railway.

4. Extend the time for responding to your subpoena to September 15, 2017, a date that allows respondents 30 days to review files likely to contain responsive information.

---

[2] "Unless otherwise limited by court order, the scope of discovery is as follows: Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

5. Ms. Lengua and Deagle's will be not be compensated for the first two hours necessary to respond to the revised subpoenae. For time spent in excess of two hours, Ms. Lengua will be compensated by your client at the rate of $50.00 per hour, a figure that is based upon income derived by Deagle's from the CMR lease.

6. Responding to Deagle's and Lengua subpoena will still require time by my office because the requests include materials in our possession. As an aside, Ms. Lengua already has incurred nearly $1,000.00 in legal expense conferring with me about the subpoena and required to write this letter. If we can resolve this matter by agreement, Becky will waive a claim for that amount and absorb the first two hours of time required to search our files.

After those initial time expenditures, our firm will need to be compensated by your client for all time spent searching files, segregating attorney-client privileged materials and preparing a production response that complies with the rules. Most of this work can be done by a paralegal at the rate of $115.00 per hour. Attorney time necessary to assist with the search and to prepare a response will be billed at the rate of $350.00. We will not charge you for preparation of a privilege log.

Please let me know if we can agree on this response to your subpoenae. If we cannot, I will be forced to file a motion to quash with a request for expenses and attorneys' fees.

Very truly yours,

E. Stanley Murphy

cc:   Becky Lengua

LAW OFFICES
DUNTON, SIMMONS & DUNTON, L.L.P.
678 RAPPAHANNOCK DRIVE
POST OFFICE BOX 5
WHITE STONE, VIRGINIA 22578-0005

E. STANLEY MURPHY
ESMURPHY@DSDLAW.COM

TELEPHONE:
(804) 435-4000
FACSIMILE:
(804) 435-1614
dsdlaw.com

August 19, 2017

Via regular mail and email to: dventker@ventkerlaw.com

David N. Ventker, Esq.
VENTTKER HENDERSON, INC.
256 West Freemason Street
Norfolk, Virginia 235120

Re: FE Partners, et al. v. Chesapeake Marine Railway, LLC, et al.

Dear David:

I am responding to your letter of August 18, 2017 sent to me after the close of business on Friday. I received your letter at 10 a.m. this morning, Saturday, August 19th, about four and a half hours ago. Before responding to your discovery proposal (essentially a two-week extension without any substantive reduction in scope of the subpoenae), I need to address several statements about your attempts to obtain informal discovery.

I acknowledge that Jeanne Noonan in your office contacted me in an effort to obtain informal discovery regarding this matter. However, I strenuously dispute your statement that we ignored or "stonewalled" you, a statement which seems to presume that the Deagles have some sort of duty to provide you with material outside the normal channels of discovery.

Commencing with the Jeanne's first contact, I told her that Captain Deagle was mortally ill and that he was not likely to survive. I also told her that his sickbed was in the house where most of the requested records are located. His daughter, Becky Lengua, was devoting full-time energies to her father's final illness, a process that not only was time-consuming but emotionally draining. At times, I was not even able to contact Becky because the demands on her were so overwhelming.

I consistently told Jeanne that Ed was not in a position to cooperate (in fact, he was not coherent) and that Becky's independent knowledge of this matter was extremely limited. In any event, there was simply no time in Becky's schedule to mount a search for documents in the midst of a death scene and full time medical attendants.

I also told Jeanne that my client was continuing lease negotiations with Chesapeake Marine Railway and that these discussions included a stipulation that the Deagles would assume a posture of strict neutrality in the *Sequoia* litigation. The Deagle family has never wanted to get involved in the controversy between FE partners and CMR and because of

some of the lease terms that are now being negotiated, there is, in fact, a legal risk to my client if it is perceived by the Farinholts as showing partiality to your client.

At one point, I expressed a preference for Becky being deposed in the case so that each side could have equal access to what she had to say and so that her testimony could then be used as a basis for developing a tailored list of materials that could be requested by subpoena. I reiterate that offer now.

Ed Deagle died on May 15, 2017 and was buried on May 18, 2017. After tending to funeral arrangements and making certain that her 91-year-old mother was cared for, Becky took an extended vacation in California to be with her daughter and granddaughter. By the time she returned to the area, you already had issued your subpoena.

It is quite incorrect and, rather insulting to suggest that you have been stonewalled or misled in any way. I have litigated in the Eastern District for nearly 35 years and am well aware of the time constraints. This does not mean however that I should be required to intrude on the family of a dying man or to impose on their grief in order to provide "informal discovery" in a case that legally has nothing to do with the Deagle family.

In addition to the practical impossibility of responding to your demands, my client is also concerned that FE's "informal requests" for information in fact may be a fishing expedition that targets Deagles Marine Railway as an additional defendant in this matter. As recently as last week, Captain Vilbus told Ms. Lengua that he "hoped Deagle's had a good lawyer" because FE was "coming after" her company. These types of comments have made Ms. Lengua even less inclined to make time to informally cooperate with you.

I heard some earlier reports myself from counsel for CMR that Deagle's is a target in this case and raised the subject with Jeanne, who assured me that there were no claims against my client. Several weeks after my inquiry however, Capt. Vilbus made his remarks to Ms. Lengua. As a matter separate from our discovery dispute, I would appreciate some clarity from you concerning whether your client has any notion of pursuing Deagle's Marine Railway in connection with damage to *Sequoia*.

Turning now to the substance of your discovery request to Deagle's and to Ms. Lengua, it does not seem to me that you have reduced the scope of the subpoena in any way.

Item 1 in your letter is a two-week extension of time which I assume is conditioned upon full compliance with the subpoena.

Item 2 is no reduction in scope of the subpoena. Privileged materials are privileged irrespective of this proposed stipulation so you are offering nothing at all.

Item 3 (reducing the scope of materials about communications with CMR to the last 11 years) also is no reduction in the scope of the subpoena because my client's relationship with CMR did not begin until 11 years ago.

Your document subpoenae address two very broad subject areas. The first is a request for all materials of any nature pertaining to the two marine railways in the CMR yard. One railway has been referred to as the "300-ton railway;" the other has been referred to as the "100-ton railway."

*Sequoia* was hauled on the 100-ton railway. Everyone agrees that the larger railway had been completely shut down for several years prior to *Sequoia* being hauled. That railway has nothing whatsoever to do with this case. Nevertheless, you persist in a request for "all records" pertaining to both railways.

As I indicated in my cure letter to Ms. Noonan, the larger railway was already in place when Ed Deagle's father bought this yard in 1933. The smaller railway is somewhat newer but also has been in place for many decades. I am not certain what records exist from the past 84 years concerning these railways. I am however certain of two things.

First, surviving records from the Deagle family's longtime operation of this yard are in storage in the attic of Ed and Kitty Deagle's house in Deltaville where they are intermixed with other family effects. As I understand it, these records have nothing to do with rental of the yard to CMR and it would be an extraordinarily burdensome and intrusive process even to retrieve and to produce these records to you.

Second, 73 years of these records have no bearing whatsoever on CMR, which leased this yard in "as is" condition in 2006. Neither the Farinholts nor their company have had access to any of these records.

This then brings me to the second broad area of your subpoena, that is, a request for all records of any nature having to do with "the facility" since July 2006. Once again, I note that the issue in your case as it relates to the railway is limited to the Farinholts' culpability for hauling *Sequoia* on the 100-ton railway. We agree with you that you should be entitled to review any records reasonably related to that subject.

With this in mind, I turn to the specific language of your request to see whether it is restricted to that topic. It is not. Instead, it requires production of:

> *All documents, only excluding those protected by attorney-client privilege or attorney work product privilege, including, but not limited to any and all correspondence, any and all attachments to said correspondence, any court filings, notes, reports, agreements, contracts, leases, or records relating to the*

*shipyard, Chesapeake Marine Railway, LLC, Chesapeake Boat Works, LLC, Jonathan M. Farinholt, or Richard L Farinholt, II.*

To begin with (and with all apologies to the author), this request, if literally read, requires production of all documents of any nature in the possession of my clients regarding any subject. The phrase "all documents" is not restricted in any way, much less restricted to the subject of this litigation.

Assuming however that the unpunctuated final clause (highlighted in blue) is intended to restrict the term "all documents," the request for unprivileged documents then would read as follows:

> *All documents relating to the shipyard, Chesapeake Marine Railway, LLC, Chesapeake boat Works, LLC, Jonathan M. Farinholt, or Richard L Farinholt, II, including, but not limited to any and all correspondence, any and all attachments to said correspondence, any court filings, notes, reports, agreements, contracts, leases, or records relating to the shipyard, Chesapeake Marine Railway, LLC, Chesapeake Boat Works, LLC, Jonathan M. Farinholt, or Richard L Farinholt, II.*

Unless you advise me to the contrary, I will assume that the request as restated above is the intent of the subpoena. Nevertheless, even if the means only "all documents relating to the shipyard, Chesapeake Marine Railway, LLC, Chesapeake Boat Works, LLC, Jonathan M. Farinholt, or Richard L Farinholt, II," it is ridiculously broad, requiring production of a vast array of documents not related in any conceivable way to your litigation.

"All documents relating to the shipyard," is essentially a request for my client's entire business records relating to this property since July 2006. This would include internal accounting records, tax returns, bank statements, corporate records, business emails and a vast array of other documents unrelated in any way either to the railways or even to the CMR tenancy. They are not relevant to this case and the fact that a lawyer can issue a virtually limitless subpoena does not obligate a respondent to stop all other work and assemble a dozen years of private records and then be put to the burden of preparing a privilege list because so many of the records are privileged or proprietary.

If we strike the word "shipyard" and restrict the subpoenae to all documents pertaining to the tenant and its principals, even then it is still too broad.

This tenant has rented the boat yard for eleven years and the property is expansive. It includes docks, piers, bulkheads, boat houses, workshops, storage sheds, an office building, a large storage yard, a travel lift and a travel lift well, none of which have anything at all to do with your lawsuit. Moreover, only a small portion of my clients' dealings with

David N. Ventker, Esq.
August 19, 2017
Page | 5

CMR and the Farinholts have anything to do with the marine railways. Many of those dealings are financial in nature and are only tangentially related to the condition of the yard, much less the railways themselves.

Please forgive me for saying so but a request of this nature borders on abusiveness. It certainly does not in any way comply with the requirements of Rules 26 and 45. Under those rules, your office has a preliminary obligation only to request information:

> [T]hat is relevant to any party's claim or defense and proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit.[1]

Moreover, when issuing a subpoena, your office has the additional burden to avoid undue burden or expense on the subpoena respondent. Rule 45 specifically provides:

> **Avoiding Undue Burden or Expense; Sanctions**.
>
> A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.[2]

Again, with all due respect, whoever wrote this subpoena elected to use a blunderbuss when the rules require a carefully aimed rifle shot. As a result, my client is now obligated to spend money negotiating a limit to the scope of these subpoenae that should never have been issued in their current form. I simply do not believe that the federal rules contemplate that sort of burden shifting.

Whether the subpoenae intended to request all documents of any nature within my client's possession, or whether it was restricted to all documents "pertaining to the shipyard," or further restricted to all records pertaining to CMR or its principals, it plainly appears that your office took no steps whatsoever to avoid imposing undue burden or expense on Deagle's or on Ms. Lengua in order to make the subpoena fit this litigation.

---

[1] Fed R. Civ. P. 26 (b)(1).
[2] Fed R. Civ. P. 45 (d)(1).

David N. Ventker, Esq.
August 19, 2017
Page | **6**

With all of this in mind, I wrote Ms. Noonan as quickly as I could after service of the subpoenae in order to reduce their scope to materials that appeared plainly related to your litigation. Now you have responded by stating that you will not voluntarily reduce the scope of the subpoenae. Under the circumstances, I have no option except to move for protective order and to ask for expenses which I think are now owed under Rule 45.

In one last effort to avoid the intervention of the court, I am reiterating my clients' offer to respond to the subpoena issued to Deagle's Marine Railway, Inc. and to Ms. Lengua by producing the following material:

1. Materials transmitted to or received from CMR regarding capacity of the 100-ton railway and materials objectively likely to be known to CMR regarding capacity of that railway.

2. Communications sent to or received by Deagle's Marine Railway, Inc. from CMR or representatives of CMR regarding capacity of the 100-ton Railway.

3. Materials in the files of Deagle's attorneys that constitute communications with CMR or its attorneys regarding capacity of the 100-ton railway.

None of which is to say that Deagle's Marine Railway and Ms. Lengua will refuse production of other materials in response to a more narrowly worded request. If you will designate the specific relevant materials that you want in a letter, we will not require you to reissue a subpoena provided that my clients are provided with a reasonable amount of time to locate that information. We will, however, treat the request in the nature of a subpoena.

If we are able to reach an agreement regarding a subpoena with reduced scope, I would still like to have until September 15, 2017 to respond. This date is 30 days from the date of service and I respectfully note that we have lost a week negotiating about the proper scope of the subpoenae.

We will also need to make some provision for my clients to be compensated for the expense associated with these requests. I suggested earlier that Ms. Lengua and Deagle's not be compensated for the first two hours necessary to respond to the revised subpoenae, but that for time spent in excess of two hours, Ms. Lengua would be compensated by your client at the rate of $50.00 per hour, a figure that is based upon income derived by Deagle's

David N. Ventker, Esq.
August 19, 2017
Page | 7

from the CMR lease. I am advising you that she has already spent far in excess of two hours hunting for relevant records.

Even if the scope of the subpoenae are restricted as I have proposed, responding to Deagle's and Lengua subpoena will still require time by my office because the requests include materials in our possession. I appreciate the offer to withdraw the subpoena to my firm and will be responding by separate letter. If we are now talking about simply producing communications with the tenant and turning over my FE file in its entirety, Ms. Lengua will absorb the expense of responding to the subpoena up to $500 in excess of what she has already spent. After that, our firm will need to be compensated by your client for all time spent searching files, segregating attorney-client privileged materials and preparing a production response that complies with the rules.

Most of this work can be done by a paralegal at the rate of $115.00 per hour. Attorney time necessary to assist with the search and to prepare a response will be billed at the rate of $350.00. If we are required to produce only third-party communications, there should be no need for preparation of a privilege log.

I am assuming that you wrote your letter hurriedly without carefully reviewing the language of what was being requested in the subpoenae and I remain hopeful that we can still reach some type of accommodation regarding this matter. Time is short however and I will need to commence work on a motion to quash late Monday afternoon.

Please let me hear from you.

Very truly yours,

E. Stanley Murphy

cc: Becky Lengua

LAW OFFICES
**DUNTON, SIMMONS & DUNTON, L.L.P.**
678 RAPPAHANNOCK DRIVE
POST OFFICE BOX 5
WHITE STONE, VIRGINIA 22578-0005

E. STANLEY MURPHY
ESMURPHY@DSDLAW.COM

TELEPHONE:
(804) 435-4000
FACSIMILE:
(804) 435-1614
dsdlaw.com

August 20, 2017
10:20 p.m.

Via regular mail and email to: dventker@ventkerlaw.com

David N. Ventker, Esq.
VENTTKER HENDERSON, INC.
256 West Freemason Street
Norfolk, Virginia 235120

Re: *FE Partners, et al. v. Chesapeake Marine Railway, LLC, et al.*

Dear David:

This letter will supplement my earlier correspondence regarding your subpoenae to Becky Lengua and to Deagle's Marine Railway.

I have spent the weekend working with Ms. Lengua trying to figure out a commonsense way to avoid further controversy. After this weekend's efforts, I am in a much better position to advise you specifically regarding what records exist and what records are simply too difficult to produce. I think this also leaves us in a position to make one last attempt at a compromise response.

Initially, let me again remark that the burden of responding to this subpoena on short notice is overwhelming. During a time when she needed to devote all of her efforts to taking care of family affairs, Becky (a widow and grandmother) has spent more than 11 hours going through corporate records of Deagle's and several hours discussing those records with me so that I can provide you with this response.

Thus far, charges for my time exceed $2,500.00 attributable exclusively to this subpoenae response. These charges would not have been incurred had the subpoenae been drawn with an eye toward minimizing expense and inconvenience on the respondent. This is my last effort to satisfy your office before going to the court to seek protective order and expenses.

Let me begin with a brief explanation of the Deagle's business situation and Becky's involvement.

As I indicated in earlier correspondence, Deagle's Marine Railway is over 80 years old (Becky corrected me today regarding the date the business was started; it was 1934 and not 1933 as I indicated in yesterday's letter). Becky's grandfather, W. E. Deagle, Sr., purchased the railway, which then consisted of the facility we have been referring to as the

"300-ton Railway." Her father, W. E. Deagle, Jr. worked in the business as a boy and again following his service in World War II, ultimately taking it over from his father. The younger Captain Deagle retired from active railway business approximately 20 years ago. As you know, he died in May at the age of 91.

The smaller 100-ton railway was built in the latter years that Ed operated the business. Since his retirement, the railway and yard have been leased to three sets of tenants, most recently Chesapeake Marine Railway ("CMR"), the defendant in your case. CMR has occupied the property commencing in October 2006 under a written lease that was long ago provided to FE Partners.

Since the time that Ed ceased active operation of the railway and yard himself, the sole business of Deagle's Marine Railway, Inc. has been leasing the property to various tenants. The company has no active employees and until the last few years, the sole person with any knowledge of its operations was Ed Deagle, who served as president until only a few years ago. Ms. Lengua's involvement in the business has been sporadic and very limited, consisting only of assisting her father, who remained alert and quite active until a few years ago.

With all of that information as background, I now turn to a discussion of physical locations likely to contain any records pertaining to Deagle's Marine Railway, Inc.

### Deagle Family Residence

When Ed retired from active operation of the railway more than 20 years ago, he packed up certain business records and mementos from the yard office and stored them in the attic of his house in Deltaville. These records are in what Becky describes to me as storage bins and are accessible only through a narrow hatch in the ceiling of the Deagle home.

Becky confirms my earlier statements that these bins are located amongst other effects of the Deagle family and that it would be exceedingly intrusive to access this information, the newest of which are well over 20 years old.

### Captain Deagle's Office

Ed maintained a small office adjacent to his residence. This office contains three filing cabinets that contain records regarding the yard and railway.

Except for a small number of records that Becky has retrieved from her father's files for business purposes in the last year or two, she has been able to confirm that these three file cabinets contain all business records of Deagle's Marine Railway, Inc. during the past 20+ years that the yard has been rented to various tenants. The records are divided into two groups.

David N. Ventker, Esq.
August 20, 2017
Page | 3

Drawers in one file cabinet contain business records relating to rental of the yard and railway. They are haphazard and have no overall organization. Two file cabinets contain predominantly personal records pertaining to Becky's father and mother and to the financial affairs of Deagle's Marine Railway, Inc., including tax returns and other sensitive documents. These latter records have slightly more organization and Becky was able to confirm for me today that to a virtual certainty they contain no records that would illuminate the central question in your case, that is, CMR's knowledge of the capacity of either railway in the yard.

The sole type of record likely to be contained in these files consists of repair supporting tax schedules and perhaps some receipts reflecting money expended by the Deagles to repair the railway.

Even if we restrict the scope of your subpoenae to records relating to repair of either the 100-ton railway or the 300-on railway, it will be an extremely burdensome process to plow through two file cabinets of sensitive financial information and to make a selective document production to your office. We conservatively estimate that retrieving documents, marking their location in the file, making copies, and then returning them to the original file, would take in excess of 15 hours. For clarity, I will refer to this cabinet as "the single cabinet."

Records in the single cabinet are more easily produced to you but they also appear to contain potentially sensitive materials, at least some of which involve litigation with CMR and the Farinholts.

<u>Dunton, Simmons & Dunton Client Records</u>

We also spent time this weekend looking at materials in my client file that constitute unprivileged communications with third parties concerning capacity of the two railways and/or damage to them. There are very few of these paper records. My office should be able to produce these to you in a few days.

Two other categories of records present a much greater and more sensitive production problem.

My partner, Craig Smith, was engaged in negotiations with CMR regarding damage to the 300-ton railway and he believes that some communications were conducted via email. Nevertheless, he has not been able to locate any stored copies of these emails and he is extremely uncertain concerning whether they might be stored in older electronic records of this law firm. Locating records of this nature will involve our IT professional and a significant investment of money. Obviously, they are intermingled with extremely sensitive client confidential matters and the burden of producing these emails would be extraordinarily high.

Craig's file also contains potentially unprivileged material pertaining to the corporate business of Deagle's, such as SCC annual filings, none of which appear to be related in any way either railway (recall that we have not been able to negotiate a reduction in the scope of your subpoenae for documents pertaining to "the yard").

For my part, I have represented Deagle's in litigation surrounding the CMR lease and related settlement negotiations with CMR's attorneys. Obviously, court filings are not privileged. I am less clear, however, concerning the discoverability of an extensive number of letters and emails between me and CMR's attorney regarding the lease.

Again, however, our communications have not involved the railways except as an item of negotiation in a commercial transaction between lawyers representing clients. I am inclined to believe that none of this material is discoverable but assembling it, organizing it, and preparing a privilege log will be extremely time-consuming. Based upon my own familiarity with the content of this material, I can assure you that there is nothing of any value to you in our letters and emails.

Aside from the very substantial burden associated with assembling and producing information regarding lease negotiations, there are also very serious policy issues surrounding discoverability of negotiations between two parties to resolve a legal dispute. Again, I approach this entire subject with the presumption that you are still interested in all documents pertaining to "the yard" and I advise you of these materials in that sense. Even if we were to reduce the scope of your subpoenae to information about capacity of the railways, there is nothing in the negotiations of counsel that would conceivably lead to the discovery of admissible evidence.

If you ask me to assemble these materials and to prepare a privilege log on short notice I will need to reassign a significant amount of work that I have been engaged to perform. Doing so will be extraordinarily disruptive to my practice and will result in a loss of income. My file contains about 10 months of papers and emails relating to contract negotiations. Third party communications are intermingled with exquisitely sensitive confidential information. I conservatively estimate that reviewing this material and producing a privilege log will require 8 to 10 hours. As indicated before, my hourly rate is $350 per hour in addition to my lost income related to reassigning other work.

With all of this in mind, I am authorized to propose the following response to your subpoenae to Ms. Lengua and to Deagle's Marine Railway, Inc. This will be our last and best effort to avoid involvement of the Court:

    A. We still need to agree on a reduction in the scope of the subpoenae, particularly as they relate to materials in possession of the respondents' attorneys.

David N. Ventker, Esq.
August 20, 2017
Page | 5

    B. Deagle's Marine Railway, Inc. maintains it objection to producing the 20+ year old materials stored in the attic of Ed's former residence.

    C. Deagle's Marine Railway, Inc. objects to searching tax and financial records for expense receipts that have little to no relevance to your lawsuit. If you persist in requesting this material, we will ask that you compensate Ms. Lengua at the rate of $50 per hour to retrieve, copy, organize and produce the receipts reflecting yard repairs during the CMR tenancy. Deagle's will not produce tax records or any financial information pertaining to operational results of its business.

    D. Ms. Lengua will assemble and transport to my office all documents, regardless of topic, that are contained in the "single cabinet" in her father's office and we will make these documents available for your inspection in White Stone commencing at 8 a.m. on August 24, 2017, subject to the following conditions:

        i. First, my office will preliminarily review the documents and withdraw any that appear to be privileged. We will preserve those documents and provide you with a privilege log. There will be no charge to your client for this review and log preparation.

        ii. We will not warrant the thoroughness of our review on short notice. Accordingly, we need written assurance that adverse parties reviewing the documents will not claim a waiver of privilege for inadvertently produced documents and that such persons will not redisclose information so produced until and unless permitted to do so by the Court.

      iii. You will designate documents that you want copied and allow my office to make these copies at the rate of .20 per page.

      iv. Counsel for CMR will be allowed to participate in the inspection and will be provided with copies requested by your office, also at the rate of .20 per page.

      v. Original documents will be preserved until the conclusion of your lawsuit.

We believe that this procedure provides you access to all non-financial, non-privileged records of Deagle's Marine Railway, Inc. of any sort for the past twenty years. The procedure significantly reduces the burden of responding to your subpoena.

E. Although you have withdrawn your subpoena to our law firm, we recognize that our files may contain non-privileged communications with third parties. Your subpoenae, of course, command production of materials in possession of the respondents' attorneys. We propose dealing with those documents as follows.

      i. As indicated above, we will produce by August 24th any paper communications regarding either railway. Copies will be .20 per page.

      ii. We object to producing communications between our office and CMR's counsel regarding lease negotiations.

      iii. If you represent that you do not have copies of pleadings from the lease litigation, we will provide you copies, again at .20 per page.

      iv. We have exhausted all reasonable searches for old emails pertaining to the railways. If you would like to fund a search for copies backed up on our servers and email client, we will ask our IT contractor to

David N. Ventker, Esq.
August 20, 2017
Page | 7

        prepare a quote for the time involved and will ask you client to pre-secure the reasonable cost of such a search.

I have devoted both days this weekend to a response to your subpoenae at considerable expense to my client and enormous imposition on my family. We believe that the foregoing proposal is responsible, proportional and more than reasonable under the circumstances. If we cannot agree to these terms by 5 p.m. on Monday, August 21, 2017, I will need to file a motion to quash your subponae.

        Very truly yours,

        E. Stanley Murphy

cc:   Becky Lengua